NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                       :
TAJA DURLING, et al.,          :
                       :
       Plaintiffs,      :
                       :    Civil No. 04-3777 (AET)
       v.            :
                       :    **OPINION & ORDER**
JOSEPH J. SANTIAGO, et al.,  :
                       :
       Defendants.    :
_____:

THOMPSON, U.S.D.J.

      This matter comes before the Court on Defendants Joseph J. Santiago, Abraham N. Hemsey, and the City of Trenton's (individually "Santiago," "Hemsey" and "City of Trenton," collectively "Defendants") separate Motions for Summary Judgment. The Court has decided these Motions after reviewing the submissions of the parties and without oral argument, pursuant to Fed. R. Civ. P. 78. For the following reasons, the City of Trenton and Santiago's Motions are granted in part and denied in part and Hemsey's Motion is granted.

BACKGROUND

      This is a dispute claiming violations of New Jersey Law Against Discrimination (the "NJLAD") and 42 U.S.C. § 1983, based on allegations of sexual harassment and retaliation. Plaintiffs Taja Durling and Peter Weremijenko are police officers for the State of New Jersey, stationed in the City of Trenton. Durling alleges that Santiago, the Police Director, created a hostile work environment by making sexual advances towards her, "designed to alarm and harass

-1-

[her] based upon her gender, on five occasions." (Compl. First Count ¶ 1.) She further alleges that Hemsey, then the Deputy Director, caused the same hostile work environment by condoning Santiago's acts. Durling describes these incidents of harassment as follows. The first encounter occurred in early August 2003, when Durling was on foot patrol outside Marsilio's restaurant in Trenton and Santiago approached her. Santiago struck-up a conversation with Durling and asked her if she wanted to be a Sergeant or Detective. Durling informed Santiago that she didn't have enough experience, then Durling alleges he touched her arm caressingly and said he could "make things happen for her." (Rittley Decl. Ex. A ¶ 5.) Durling recalls Santiago standing very close to her when he spoke, and that she tried to back up, but his proximity "freak[ed her] out." (Id. Ex. B, 253:3-6.)

The second incident occurred roughly a week later. Santiago again approached Durling while she was on foot patrol and asked her to enter Diamond's Restaurant with him to discuss police procedures. (Id. Ex. A ¶ 5.) While there, Durling alleges that Santiago said to her to "come give your boss a kiss" and commented on her appearance asking others "is she not cute." (Id.) Also, Santiago told Durling that she would be perfect for the horse or motorcycle unit of the police force, to which she replied that she did not know how to ride either and lacked the proper experience. Santiago's purported response was that her qualifications did not matter because "[she] could still wear the high black leather boots for [him], but only if that is all [she wore]." (Id.) Durling claims that Hemsey was at Diamond's Restaurant during the incident, but took no action to stop Santiago's comments. However, she also notes that she did not ask him to intervene, nor did she express distress at Santiago's comments. (Id.)

The third incident occurred sometime thereafter, at Marsilio's restaurant, when Durling

entered the restaurant as part of her patrol.  Inside, Santiago sat at the bar with Hemsey, with the Mayor of Trenton sitting several feet away.  Santiago allegedly again asked Durling to "come here and give your boss a kiss." (Id. at Ex. B 291:7-9.)  Durling claims Santiago touched her arm, though she slowly pulled it away.  Again, Hemsey was there, and again Durling recounts that he said nothing to her, and she said nothing to him.  (Id. Ex. B 294:6-13.)  The fourth incident occurred on August 28, 2003, when Santiago stopped Durling while she was on foot patrol inside Marsilio's restaurant.  Santiago allegedly questioned her about Weremijenko, whom Durling admits to having had a romantic relationship with at the time.  (Durling Dep. 302:20-303:5.) Santiago reportedly asked Durling how she likes Weremijenko, to which she replied that he was a smart guy.  Santiago replied that he did not find Weremijenko to be smart.  (Rittley Decl. Ex. A ¶ 5.)  Shortly thereafter, Santiago left Marsilio's to meet with Weremijenko, which is discussed in greater detail below.  In late August or early September 2003, Durling reported Santiago's actions to Weremijenko and another of her superiors, Captain Seaman.  She also requested an assignment transfer from Captain Seaman, to limit her interaction with Santiago.  (Rittley Decl. Ex. H, 13:5-20:10).

Then in February 2004, outside Clara's Bar at a crime scene, Santiago allegedly called Durling over, and asked her how she liked her assignment.  Durling recalls feeling distressed at his presence and separated herself by placing her partner Officer Fackenthal in front of Santiago. After Santiago received no response from Durling he walked away.  (Id. Ex. B 321:11-322:11.) Durling claims these incidents caused her "extreme embarrassment and humiliation" and a general feeling that she caused her harassment.  (Pl.'s Opp'n 9.)  Fackenthal remembers nothing unusual or uncomfortable about the interaction, and does not recall placing himself between

-3-

Santiago and Durling.  (See Santiago Br. in Supp. Mot. Summ. J.  H 10:20-11:18.)

Weremijenko's complaint stems from alleged retaliation against him by Santiago and the City of Trenton because Weremijenko reported Durling's alleged harassment.  The sole basis of Weremijenko's claim are the events of August 28, 2003.  Upon leaving Marsilio's restaurant, Santiago and Hemsey met Weremijenko at his post in the Mill Hill area.  Weremijenko, as a Sergeant, admitted that he was responsible for making sure his posts are watched by an officer. (Santiago Br. in Supp. Mot. Summ. J. Ex. J.)  On that night, the Mill Hill post had been unmanned for over four hours without Weremijenko's knowledge.  (Rittley Decl. Ex. D 205:3-6; 206:4-6.)  While Weremijenko met with Santiago and Hemsey at the post, another superior officers informed them that the Mill Hill area had been unmanned.  Weremijenko alleges that upon hearing this Santiago became "enraged."  (Id. at 208:1-4.)  He then asked Weremijenko what the boundaries of the Mill Hill post were and Weremijenko did not know.  Then Santiago said to Weremijenko "I don't think you're so smart."  (Id. at 209:1-14.)  As punishment for the post being unattended, Santiago told Weremijenko that he had to do a foot patrol of the area for two days.  (Id.)  According to Weremikenko, Hemsey and he exchanged no words, other than an initial hello.

After the incident Weremijenko wrote a letter to the superior officer who reported that the Mill Hill post was unattended.  In the letter, Weremijenko stated that he met with Santiago and Hemsey and he acknowledged that "the post was in fact unmanned."  (Santiago Br. in Supp. Mot. Summ. J. Ex. J.)  Weremijenko accepted responsibility, stating "[t]his was an oversight on my part and of course will not happen again."  (Id.)  He also stated that if he checked with the officer generally in charge of patrolling that area he "would have realized that the post was unmanned

-4-

and [he] could have alleviated the problem."  (Id.)  Weremijenko closed the letter by stating "I feel I could have supervised my area better today [and] . . . . I assure you I will do everything in my power not to let this happen again."  (Id.)

After voluntarily dismissing various of their claims, Plaintiffs assert the following counts: (1) Santiago and Hemsey's sexual harassment of Durling and retaliation against Weremijenko under the NJLAD; (2) Hemsey and the City of Trenton's "condoning" of sexual harassment of Durling and retaliation against Weremijenko under the NJLAD; (3) Santiago and the City of Trenton's creation of a hostile work environment for Durling and Weremijenko under the NJLAD; (7) Santiago's sexual harassment of Durling under 42 U.S.C. § 1983; and (8) Santiago and the City of Trenton's harassment of Weremijenko under 42 U.S.C. § 1983.[1]

The City of Trenton, Santiago and Hemsey have all moved individually for summary judgment against all claims.[2]

DISCUSSION

A.   Standard for Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d

---

[1]Plaintiffs dropped Hemsey from this claim in its opposition to summary judgment.

[2]The City of Trenton also moves for summary judgment that Plaintiffs may not recover economic or punitive damages.  As Plaintiffs conceded they received no economic losses this aspect of the City of Trenton's motion is granted.  Further, the Court will dismiss the claim of punitive damages against the City of Trenton because, as the Supreme Court has ruled, a governmental entity cannot be assessed punitive damages, absent exceptions that are inapplicable here.  City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).

1358, 1366 (3d Cir. 1996).  The moving party bears the initial burden of showing the absence of

a genuine issue of material fact.  Celotex, 477 U.S. at 323; Padillas v. Stork-Gamco, Inc., 186

F.3d 412, 414 (3d Cir. 1999).  The moving party may cite to the pleadings, deposition, answers to

interrogatories, or admissions on file, to demonstrate that no genuine issue of material fact exists

and that the party is entitled to judgment as a matter of law.  Lawyers Title Ins. Corp. v. Philips

Title Agency, 361 F. Supp. 2d 443 (D.N.J. 2005).   "[L]egal conclusions, unsupported by

documentation of specific facts, are insufficient to create issues of material fact that would

preclude summary judgment."  Jersey Cent. Power & Light Co. v. Twp. of Lacey, 772 F.2d 1103,

1109-10 (3d Cir. 1985).

B.      Durling and Weremijenko's NJLAD Claims

As an initial matter, Durling and Weremijenko may not sue Santiago and Hemsey for

discrimination as individuals under the NJLAD, because they are not "employers."  Tarr v.

Ciasulli, 181 N.J. 70 (2004) (dismissing claims of discrimination against employee supervisors

stating that the NJLAD only prohibits discrimination by "an employer").  Plaintiffs' first count is

asserted against Santiago and Hemsey,  and therefore it must be dismissed for failure to state a

claim.[3]  The First Count also claims Hemsey aided and abetted discriminatory acts.  Although

aiding and abetting claimed against a non-employer may constitute a viable claim under the

NJLAD (N.J.S.A. 10:5-12(e)), the record appears to completely lack evidence that Hemsey did

---

[3] Plaintiffs do not dispute that Santiago cannot be liable under the NJLAD because he is
not Durling or Weremijenko's employer. (See Pls.' Opp'n 17.)  However, they state "Plaintiffs
are seeking to hold only the City [of Trenton] liable for the actions of Santiago in this Count as
[their] employer."  Id.  Plaintiffs may not change their complaint by dint of argument within a
brief, and the period for amending the complaint as a matter of right has long since passed.  Fed.
R. Civ. P. 15(a). Therefore Court will not read Count One as asserted against the City of Trenton.

anything to "aid or abet" Santiago in the alleged discriminatory or retaliatory acts.  See Tarr, 181 N.J. 70, 84 ( stating "in order to hold an employee liable as an aider or abettor, a plaintiff must show that . . . the defendant must knowingly and substantially assist the principal violation.") (internal quotations omitted).  Rather, the record reflects that at all times Hemsey said nothing to Plaintiffs and Plaintiffs said nothing to him. Therefore, the claim that Hemsey aided and abetted harassment must also be dismissed.

As to Durling and Weremijenko's Second Count against Hemsey and the City of Trenton for "condoning sexual harassment" of Durling, this claim must also be dismissed because it does not constitute a valid claim under the NJLAD jurisprudence.  (Compl. Count Two.)  Plaintiffs cite Demas v. Nat'l Westminster Bank, 313 N.J. Super. 47, 52 (App. Div. 1998), for the general proposition that an employer may be liable when its supervising employee ratifies or "condones" the acts of another non-supervisory employee.  Irrespective of that general statement of agency law, that litigation was not brought under the NJLAD but under the Conscientious Employee Protection Act.  Further, in that case the appeals court ruled in favor of the employer because the conduct complained of was not attributable to it.  Id. at 51.  This Court is aware of no authority, and Plaintiffs have cited none, for the proposition that Hemsey or the City of Trenton may be held liable for "condoning" the sexual harassment of another employee, thus the Court dismisses this claim.

1.    Durling's Hostile Work Environment Claim

The remaining NJLAD claim is against the City of Trenton, for Santiago's intentional

conduct against Durling, which created a hostile work environment.[4]  According to the Third

Circuit, a prima facie case for a hostile work environment claim under the NJLAD is the same as

under Title VII, and consists of five elements:

> (1) the employee suffered intentional discrimination because of [her/his gender], (2) the discrimination was severe and pervasive,[5] (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same [gender] in that position, and (5) the existence of respondeat superior liability.

 Allen v. Amtrak, No. 05-cv-4551, 2007 U.S. App. LEXIS 2216, at *4 (3d Cir. Jan. 31, 2007).

Whether a hostile work environment claim is actionable depends upon "all the circumstances,

including the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance."  Amtrak v. Morgan, 536 U.S. 101, 116 (2002) (internal

citations omitted).

        Here, Plaintiff has established a prima facie case of hostile work environment.  As to the

first element, Plaintiff alleges that on several occasions Santiago asked her to "give her boss a

kiss."  Furthermore, he made comments of an overtly sexual nature, implying that she could

advance in the ranks if she "w[ore] high black leather boots for [him], but only if that is all [she]

wore]."  Santiago's alleged remarks, in public, while Durling was on the job conducting patrols,

---

        [4]To the extent Count Three is raised against Santiago, it too must be dismissed because Santiago is not "an employer" under the NJLAD.  Tarr, 181 N.J. 70.

        [5]The Third Circuit has required that discriminatory harassment be "pervasive and regular."  See, e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir.2001).  In Pennsylvania State Police v. Suders, 542 U.S. 129, 133-34 (2004), the Supreme Court clarified that the harassment must be "sufficiently severe or pervasive to alter the conditions of [the complainant's] employment." See also Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006).

satisfies the first prong that Durling experienced intentional discrimination due to her gender.

Under the second prong, Durling must demonstrate that Santiago's acts were "sufficiently severe or pervasive to alter the conditions of [her] employment."   Pennsylvania State Police 542 U.S. at 133-34.  The Third Circuit has interpreted that standard to constitute an amalgamation of the second prong and fourth prong, which requires that the discrimination affect a reasonable person in the plaintiff's position.  Jensen, 435 F.3d at 451.  A hostile work environment claim may not "rely upon casual, isolated, or sporadic incidents."  Boyer v. Johnson Matthey, Inc., No. 02-8382, 2005 U.S. Dist. LEXIS 171, at *58 (E.D. Pa. Jan. 7, 2005) ("Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment.") (citing  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Here, however, beyond Santiago's several overtly sexually inappropriate comments, such as "give your boss a kiss," he also implied on two occasions that he could promote Durling or "make things happen for her" irrespective of her experience on the police force.  Furthermore, he engaged in this behavior on Durling's beat, where she could not simply avoid him, but was required to patrol.  This was not just "simple teasing" or mere "discourtesy or rudeness," of the kind that may be countenanced in a typical police force setting.  Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 422-23 (D.N.J. 2003) (citing Abramson v. William Paterson College of N.J., 260 F.3d 265, 280 (D.N.J. 2001) (quoting Faragher, 524 U.S. 775).  Rather, because the comments related to Durling's opportunity to rise in the ranks, and Durling could not avoid these encounters, a jury could find they may have "alter[ed] the conditions of [Durling's] employment and create[d] an abusive working environment."  Pennsylvania State Police , 542 U.S. at 133-34.

Fittingly, the New Jersey Supreme Court has noted that "[t]he severity of a remark is also exacerbated when uttered or sanctioned by a supervisor or superior," such as Santiago is here. Lehmann v.Toys R Us, Inc., 626 A.2d 445, 455 (1993); Hargrave, 262 F.Supp.2d at 416 ("New Jersey Supreme Court has observed, a jury could reasonably conclude that the impact and severity of [the employee's] conduct was aggravated by the fact that he was a member of the management staff with direct responsibility for supervising Plaintiff's work performance."); Flizack v. Good News Home for Women, Inc., 346 N.J. Super. 150, 160 (App. Div. 2001) (ruling that the alleged harasser's supervisory status greatly magnified the gravity of the conduct).

While this case does not portray the quintessential example of "severe or pervasive" conduct, examining the facts in a light most favorable to Durling, the Court is satisfied that she has raised a genuine issue of material fact for a jury to decide.  See, e.g., Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir.2005).

The City of Trenton does not contest the remaining elements of the standard, and, in any event, the Court finds that Durling has met them.  See, e.g., Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 117 (1999) (stating respondeat superior liability was established because "an employer is generally liable for a hostile work environment created by a supervisor") (citations omitted).  Therefore, Durling has established a prima facie case.

> 2.    The City of Trenton's Affirmative Defense

Under Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-5 (1998), the Supreme Court has ruled an affirmative defense exists under Title VII for employers accused of creating a hostile work environment, if the employer has: (1) established procedures to prevent and promptly correct sexually harassing behavior; and (2) the Plaintiff unreasonably failed to avail herself of

those corrective or preventative opportunities.  Id.  It is currently an open question whether the

New Jersey Supreme Court has endorsed this affirmative defense in the NJLAD context.  See

Entrot v. BASF Corp., 359 N.J. Super. 162, 187-88 (App. Div. 2003) (exploring the defense in

the NJLAD context); see also Mancuso v. City of Atlantic City, 193 F. Supp. 2d 789, 798-801

(D.N.J. 2002) (noting the New Jersey Supreme Court has never endorsed this defense, and

providing a reasoned analysis questioning its applicability to the NJLAD).  The court concludes

that even if the New Jersey Supreme Court adopts the affirmative defense, it would nonetheless

be inapplicable in this instance because there remain "substantial issues of material fact relating

to [the City of Trenton's] exercise of reasonable care to prevent and correct instances of sexual

harassment within its workplace . . . such that, even if the . . . affirmative defense did apply . . .

summary judgment in favor of the City would nonetheless be inappropriate."  Id.

      The City of Trenton alleges that the Plaintiff had available two remedial procedures to

rectify and report Santiago's alleged harassment, but she used neither.  (See, e.g., Trimboli Cert.

Ex. 5 (stating the "General Order 2002-04 of the City of Trenton Police Department," requires

victims to "confront the perpetrator of the harassment, and document the incident,"); and

Trimboli Cert. Ex. 8 (stating "the City-wide Sexual Harassment Policy and Process/Procedure"

requires the Office of the City Business Administrator to investigate Department Directors who

are alleged to have committed harassment).)  The City of Trenton further claims that officials

first learned of Durling's grievance via a newspaper article reporting that Durling filed the instant

lawsuit.  However, it is undisputed that Durling did inform her immediate supervisor

Weremijenko about Santiago's alleged harassment.  (See, e.g., Rittley Decl. Ex. D 138:1-24).

Further, the Mercer County Prosecutor's Office interviewed Durling regarding her complaint,

and she also told her superior, Captain Seaman.  (Rittley Decl. Ex. H 18-20, 22:9-23; Ex. I.)

Captain Seaman even expressed concerns that the regime established to correct harassment was

flawed in this instance, because "the guy [she was] alleging that's doing these things[, Santiago,]

is the guy I'm supposed to be reporting it to."  (Id. at 19:10-12.)

   In this case, because the harassment allegedly came from the department supervisor,

Santiago, who is specifically charged with preventing such actions, and Durling reported the acts

to several other superiors, it is clear that the City of Trenton was formally on notice of what

occurred.  See, e.g., Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 118 (3d Cir. 1999)

(stating the plaintiff "had no obligation to try all these mechanisms, because her immediate

supervisor, who was responsible for preventing and redressing harassment pursuant to the

[Atlantic City Police Department's] own policy, was on notice of the harassment"); see also

Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir. 1998) (holding that if a direct supervisor

who had the responsibility to stop harassment knew of and failed to act against it, the plaintiff

had no further obligation to bring it to the employer's attention); Young v. Bayer Corp., 123 F.3d

672, 675 (7th Cir. 1997).  Therefore, the City of Trenton's possible affirmative defense has been

sufficiently rebutted.

   3.  Weremijenko's Claim of Hostile Work Environment

   Weremijenko's claim of hostile work environment under the NJLAD fails as a matter of

law because he cannot establish a prima facie case, as the he does not argue he "suffered

intentional discrimination because of [his gender]."  Allen, 2007 U.S. App. LEXIS 2216, at *4.

It appears the more suitable cause of action under these facts would have been to assert a

retaliation claim under the NJLAD.  Because Weremijenko did not plead this claim the Court

-12-

does not interpret it as such.  See infra fn. 3.  However, even if Weremijenko had brought such a claim it too would have failed as a matter of law.  To succeed in an NJLAD retaliation claim, and employee must show "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action."  Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).  Here, Weremijenko did not suffer from an adverse employment action.  His sole complaint was that he had to perform an assignment beneath his rank for two days.  This inconsequential, de minimis action fails to constitute an adverse employment action.  Carmichael v. Pennsauken Tp. Bd. of Educ., 462 F.Supp.2d 601, 612 (D.N.J. 2006) (stating "courts have required that the nature of the retaliatory acts committed be more than de minimis or trivial"); Marrero v. Camden County Bd. of Social Servs., 164 F.Supp.2d 455, 473 (D.N.J.2001) (stating an "adverse employment action for . . . must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate, or classify the plaintiff in a way which would tend to deprive [him] of employment opportunities or . . . affect [his] status as an employee").  Further, Weremijenko failed to show that Santiago's actions were motivated by anything other than distress at Weremijenko's failure to know the boundaries of his post and properly supervise it.  Thus he failed to establish the critical "causal link" between the adverse action and his alleged protected activity.  As such, even if Weremijenko had pled retaliation under the NJLAD that claim would have failed as well.

C.      Durling and Weremijenko's 1983 Claims

        In Count Seven, Durling brings a 42 U.S.C. § 1983 claim against Santiago for sexual

harassment.  Under <u>Bradley v. Pittsburgh Board of Education</u>, 913 F.2d 1064, 1078-79 (3d Cir.

1990), the Third Circuit stated that litigants may bring discrimination claims under either § 1983,

or Title VII, and although they constitute distinct claims, "in practice the burdens of proof are the

same."  <u>Mobley v. City of Atlantic City Police Dept.</u>, No. 97-2086, 2000 WL 363692, at *5

(D.N.J. Mar. 30, 2000); <u>Whitaker v. Mercer Co.</u>, 65 F. Supp. 2d. 230, 242 (D.N.J. 1999), <u>aff'd</u>,

251 F.3d 155 (3d Cir. 2000).  As Durling's claim survived the Title VII analysis (for her NJLAD

claim), it also survives for the § 1983 claim.

      In Count Eight, Weremijenko brings a § 1983 claim against Santiago and the City of

Trenton for harassment, for the acts occurring on August 28, 2003.  Santiago, as a government

official engaged in discretionary functions, is entitled to qualified immunity from suits brought

under § 1983.  <u>See</u> <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 398-99 (3d Cir.1997).  He is therefore

immune if his "conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  <u>Id.</u> at 399 (internal quotation omitted).

Weremijenko has the burden to prove, but has failed to show that Santiago's conduct violated

some clearly established right.

      Weremijenko has not explained how the defendants did anything affirmatively to deprive

him of his rights or privileges under the Constitution  The retaliation which Weremijenko

complains of was that he was made to walk the Mill Hill beat during working hours on foot for

two days.  This fails to constitute a deprivation of a constitutional right.  <u>Pascucci v. Twp. of

Irvington, Irvington Police Dept.</u>, 46 Fed. Appx. 114, 118 (3d Cir. 2002).  Although,

Weremijenko argues that this task was beneath his rank, and not a valid form of discipline under

the "Rules and Regulations" of the Police Department, (Pls.' Op. 6) the relevant issue is whether

-14-

that constituted a violation of a clearly established constitutional right.  The Court finds that it cannot be such, as a matter of law.  Weremijenko was given the option to undertake this task, presumably to better acquaint him with the boundaries of the post he supervised, or face formal disciplinary charges.  (Santiago's Ex. I,  9:1-11:1.)  Weremijenko chose to accept that punishment, which cannot be equated to a violation of clearly established constitutional right.

Further, Weremijenko suspects that the altercation with Santiago was caused by his reporting Durling's harassment.  However, Weremijenko has provided no evidence that Santiago knew Durling spoke to him, nor has Weremijenko produced evidence tending to show that Santiago knew that Weremijenko had or intended to report Durling's claim of harassment. (See Rittley Decl. Ex. D, 260:6-20; 261:20-262:5).  Therefore his claim § 1983 claim against Santiago must fail.

Weremijenko's claim against the City of Trenton also fails.  For the City of Trenton to be liable under § 1983 harassment, Weremijenko must show that his rights were violated because of the City's "policy or custom."  See, e.g., Watson v. Abington Twp., 478 F.3d 144, 156 (3d Cir. 2007) (affirming municipality's award of summary judgment because plaintiff failed to raise any "inference of a policy or practice of discrimination by the [Police] Department").  Weremijenko fails in both regards, as has not shown how his rights were violated or the existence of a "policy or custom" of the City of Trenton which caused such violation.  Therefore this claim must be dismissed.

CONCLUSION

For the foregoing reasons,

IT IS on this 9th day of July, 2007,

-15-

**ORDERED** that Defendant Hemsey's Motion for Summary Judgment [49] is **GRANTED**; and it is further

ORDERED that he is dismissed as a Defendant to this action; and it is further

ORDERED that Defendant Santiago's Motion for Summary Judgment is **GRANTED** as to Count 1, Count 2 and Count 3, which are **DISMISSED**; and it is further;

ORDERED that Defendant Santiago's Motion for Summary Judgment [50] is **DENIED** as to Count 7; and it is further

ORDERED that Defendant City of Trenton's Motion for Summary Judgment [47] is **GRANTED** as to Count 2 and Count 8, which are **DISMISSED**; and it is further

ORDERED that Defendant City of Trenton's Motion for Summary Judgment is **DENIED** as to Count 3.


s/Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.

-16-